THOMAS NEVIUS, APPELLANT, *v.* THE
STATE OF NEVADA, RESPONDENT.

No. 14683

May 20, 1985                                                        699 P.2d 1053

---

[1]THE HONORABLE DAVID ZENOFF, Senior Justice, was designated to participate in this case. Nev. Const., art. 6 § 19; SCR 10.

[Rehearing denied December 23, 1985]

*John J. Graves,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert J. Miller,* District Attorney, and *James Tufteland* and *Thomas R. Green,* Deputy District Attorneys, Clark County, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

A jury convicted appellant Thomas Nevius of one count of first degree murder and three other felonies: burglary, robbery and attempted sexual assault, all with the use of a deadly weapon. At the penalty hearing on the first degree murder conviction, the jury found that the homicide was committed under four aggravating circumstances and under no mitigating circumstances. The jury returned the penalty of death. On appeal, Nevius raises numerous assignments of error, none of which is of sufficient merit to warrant reversal of the judgment of conviction or the sentence. Having found no error, and having concluded that Nevius was fairly tried, convicted and sentenced, we affirm.

### THE FACTS

On the evening of July 12, 1980, appellant and three other men decided to burglarize an apartment in Las Vegas. They selected the residence of David and Rochelle Kinnamon and entered the apartment while Rochelle Kinnamon was home alone. Appellant accosted Mrs. Kinnamon at gunpoint and asked her where she kept her money and diamonds. Learning that the Kinnamons had little money and few items of value in their home, appellant and another man dragged Rochelle into the bedroom and placed her on the bed. Appellant attempted to assault Rochelle sexually while holding a revolver to her jaw. During the attempted assault the two other men ransacked the kitchen and living room areas of the apartment. David Kinnamon suddenly returned home from work, causing the four men to flee through the bedroom window, leaving Rochelle Kinnamon huddled on the bed. As appellant, the last man out, climbed through the window, David Kinnamon opened the bedroom door and said, "What's going on?"; appellant turned and fired four shots at David as he stood in the bedroom doorway, and while his wife lay on the bed between the window and the door. David Kinnamon died almost instantly from massive hemorrhaging caused by a bullet wound to the brain. Ballistics testimony revealed that appellant's revolver was a .38 loaded with hollowpoint ammunition.

At the guilt phase of appellant's trial, Rochelle Kinnamon testified in detail concerning the events of the evening of her husband's murder. She positively identified appellant as the man who fired the fatal shots, stating that she would never forget his face. The state also presented the testimony of David Nevius, appellant's stepbrother and one of the three men involved in the

burglary. David Nevius confirmed that the four had planned a burglary, and he testified that appellant had a .38 snubnose revolver with him when he entered the Kinnamon home. David Nevius further testified that after the shooting, when the quartet gathered at the Nevius family home, appellant admitted that he fired the gun and that he might have shot someone; appellant also admitted that he "may have" sexually assaulted Mrs. Kinnamon, and said, "I almost could have f----d her." Other testimony and physical evidence established that a .38 revolver recovered from the Nevius residence fired the fatal bullets. A pair of pants identified by Rochelle Kinnamon as those worn by the robber were found in or near appellant's bedroom. Rochelle Kinnamon's watch was also found in the Nevius home, along with a box of .38 ammunition of the same type as that recovered from David Kinnamon's body.

Appellant's defense was essentially one of misidentification. He admitted that he was involved in the crime but claimed that he was not the one who fired the revolver that killed David Kinnamon. During his cross-examination of Rochelle, appellant sought to impeach her eyewitness identification. The cross-examination established that although Rochelle testified on direct that the bedroom lighting was adequate for an identification, and that she was positive it was appellant who had fired the shots, Rochelle had told the grand jury that it was dark in the bedroom and that she could not actually identify the killer. Rochelle Kinnamon explained these discrepancies by explaining her emotional state at the time of the grand jury proceedings, which were conducted fairly soon after her husband's murder.

In furtherance of his defense of misidentification, appellant presented the testimony of a hair analyst, who told the jury that the hairs found on a discarded cap, supposedly worn by the killer, were either dissimilar to or inconsistent with the hairs of Thomas Nevius. Gregory Leon Everett, the third man involved in the burglary, had received a life sentence for felony murder for his role in the killing; he testified that appellant was involved in the incident but did not kill the victim. Appellant also brought out certain facts which suggested that appellant did not own the pants identified by Rochelle, and which suggested that it was Everett, not appellant, who fired the revolver. Rochelle had testified that appellant briefly lost the revolver during the attempted sexual assault; the defense evidence suggested that Everett entered the bedroom, obtained the weapon, and killed David Kinnamon while fleeing the apartment.

In rebuttal, the state presented a videotaped statement made by Everett soon after the shooting, in which he identified appellant as the killer. The state also presented testimony refuting Everett's

claim at trial that this statement was false and was coerced by police.

The jury was instructed on both premeditation/deliberation and felony murder theories of liability for first degree murder. The jury returned a general verdict finding appellant guilty of murder, but without specifying upon which theory its verdict was based. The jury also found appellant guilty of the burglary of the apartment and the robbery and attempted sexual assault of Rochelle Kinnamon, all with the use of a deadly weapon.

At the penalty hearing held on the first degree murder conviction, the state sought the death penalty based on the following alleged statutory aggravating circumstances: (1) that the murder was committed by a person previously convicted of another murder or violent felony; (2) that the murder was committed by a person under a sentence of imprisonment; (3) that the murder was committed by a person who knowingly created a great risk of death to more than one person, by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person; and (4) that the murder was committed during the course of a burglary, robbery and attempted sexual assault. *See* NRS 200.033(1), (2), (3), (4).

The state established the first aggravating factor by presenting evidence that appellant was convicted of second degree murder in Philadelphia in 1971, at the age of 15. The state established the second factor by showing that appellant was sentenced to five to fifteen years in a minimum security juvenile facility for the murder, but that he had escaped from custody prior to the expiration of his sentence. The evidence revealed that appellant had been granted parole and that he had been placed in a transitional facility for prospective parolees, but that he had become frustrated at the six-month delay of his release papers and walked away from the institution. Although this record does not show that the State of Pennsylvania has made any attempts to obtain custody of appellant to institute revocation proceedings, the evidence did establish that appellant was still "under a sentence of imprisonment" at the time of the Kinnamon murder.

The state established the third and fourth aggravating factors by citing evidence presented at the guilt phase, *i.e.*, that Rochelle Kinnamon was in the bedroom close to the path of the bullets fired at her husband, and that the murder was committed during the commission of the three listed felonies. The state again played Everett's videotaped statement which implicated appellant as the killer.

Nevius presented considerable evidence in mitigation of punishment. He established that he had been a model inmate at the Pennsylvania facilities and at the Clark County jail. He presented

the testimony of the attorney who represented him in the prior murder proceeding, who testified that the murder was one of many youth gang killings that occurred in Philadelphia in the early seventies. The attorney related that the killing was not a classic case of first degree murder and had some elements of self-defense. The attorney also described the Philadelphia ghetto area in which appellant was raised as a "jungle."

Sonny Nevius, appellant's father, testified that appellant had been raised by an alcoholic, possibly abusive mother of some apparent emotional instability; he told the penalty jury that his son was a good man, whom he loved and whom he did not want to die. Dorothy Benson, the mother of appellant's young son, testified with the boy on her lap and told the jury that the appellant meant everything to her. Other witnesses expressed their love for appellant and confirmed his difficult background.

Gregory Everett testified that appellant was intoxicated at the time of the murder. According to Everett, on the day of the killing appellant drank at least a half-pint of vodka, and the four men disposed of fifteen marijuana cigarettes and an unknown number of quaaludes; Everett described appellant as "drunk" and "high."

Appellant took the stand on his own behalf and related his version of the events of July 12. He told the penalty jury he had drunk heavily that day, had smoked marijuana and had taken two quaaludes. He described himself as "pretty spaced out." He admitted involvement in the burglary but denied he fired the shots that killed David Kinnamon, and he expressed remorse over his death. He insisted that he lost the gun in the bedroom and that it was retrieved by someone else. He stressed a point established by the state's own evidence, namely, that although he was supposedly the last man out the bedroom window he was the first to arrive back at the Nevius home. Appellant concluded by relating his love for his young son and by promising that if he did not receive the death penalty he would rehabilitate himself in prison. Appellant was 24 years of age at the time of the murder.

The jury found that the murder was committed under all four of the alleged aggravating circumstances and under no circumstances in mitigation, and sentenced appellant to death.

On appeal from the judgment and sentence, Nevius presents numerous assignments of error, some pertinent to only the guilt or the penalty phases and some pertinent to both. We now turn to a discussion of appellant's contentions.

### ISSUES PERTINENT TO BOTH THE GUILT AND THE PENALTY PHASES

1. Appellant, a black, was convicted and sentenced to death by an all-white jury for the murder of a white man and the

attempted sexual assault of a white woman. During the jury selection process, the prosecutor used six of its seven peremptory challenges to remove all four blacks and both Hispanics from the jury panel. Appellant argues that the prosecutor misused his peremptory challenges to remove the jurors solely on the basis of minority group membership, and thereby deprived appellant of his sixth amendment right to a jury drawn from a fair cross-section of the community.

The issue of whether a prosecutor may use peremptory challenges to remove from a jury panel all members of a specifically cognizable group, particularly a racial or ethnic minority, has received considerable attention from courts and commentators.

The watershed case in this area is Swain v. Alabama, 380 U.S. 202 (1965). The *Swain* court stressed that by its very nature a peremptory challenge is exercised on the basis of subjective, inchoate reactions to a potential juror, based on sudden, unaccountable prejudices triggered by gestures, appearance, and the like; it is a challenge exercised without a reason given or a judicial inquiry into the motive for its exercise. 380 U.S. at 212-21. The court held that the striking of all members of the defendant's minority group in a given case does not offend the Equal Protection Clause, because "[i]n the quest for an impartial . . . jury" all members of a cognizable racial, religious or other group "are alike subject to being challenged without cause." 380 U.S. at 221.

The Supreme Court reviewed the history of peremptory challenges and held:

> The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. State v. Thompson, 68 Ariz. 386, 206 P.2d 1037 (1949); Lewis v. United States, 146 U.S. 370, 378. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. Hayes v. Missouri, 120 U.S. 68, 70. It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another,' Lewis, *supra,* at 376, upon a juror's 'habits and associations,' Hayes v. Missouri, *supra,* at 70, or upon the feeling that 'the bare questioning [a juror's] indifference may sometimes provoke a resentment,' Lewis, *supra,* at 376. It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. . . .
> (Footnote omitted.)

*Id.* at 220.

The Court concluded:

> In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case.

*Id.* at 222.

Appellant urges us to adopt the ruling in People v. Wheeler, 583 P.2d 748 (Cal. 1978) which rejected the *Swain* approach and permitted a case-specific inquiry into a prosecutor's motives for using peremptory challenges to remove minority jurors from a jury panel.

*Wheeler* noted that after *Swain* the United States Supreme Court decided Taylor v. Louisiana, 419 U.S. 522 (1975), which held that a criminal defendant has a sixth amendment right to a jury drawn from a fair cross-section of the community. *Taylor* involved an earlier stage of the jury selection process, however, and condemned the exclusion of a cognizable group from *eligibility* for jury duty; the *Taylor* ruling did not speak to the traditional role of the peremptory challenge.[1] The *Wheeler* court nevertheless extended the cross-section rule into the area of peremptory challenges, notwithstanding the traditional view that peremptories may be exercised for any reason or no reason.

*Wheeler* has been followed in few instances. *E.g.*, Commonwealth v. Soares, 387 N.E.2d 499 (Mass. 1979), *cert. denied,* 444 U.S. 881 (1979); State v. Crespin, 612 P.2d 716 (N.M.App. 1980). Most courts have declined to follow it. State v. Stewart, 591 P.2d 166 (Kan. 1979); Lawrence v. State, 444 A.2d 478 (Md.App. 1982), *aff'd,* 457 A.2d 1127 (Md. 1983); State v.

---

[1]The Court of Appeals of New York rejected a request that it no longer follow the holding of the Supreme Court in *Swain.* The court made clear its understanding that the holding in *Swain* had not been affected by *Taylor:*

> The issue of minority representation on criminal juries has been the subject of several decisions by the Supreme Court. These decisions draw a critical distinction between the jury pool, which is the group of prospective jurors from which the litigants will select a jury to hear their particular case, and the jury that is ultimately chosen to serve. The Sixth Amendment requires that the jury pool be selected from a representative cross section of the community (Taylor v. Louisiana [(1975)], 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690), and distinctive groups in the community may not be systematically excluded from the pool. Once the jury pool is selected, however, prospective jurors may then be excluded through the exercise of cause challenges and peremptory challenges.

People v. McCray, 443 N.E.2d 915, 916-17 (1982), *cert. denied,* 461 U.S. 961 (1983).

Sims, 639 S.W.2d 105 (Mo.App. 1982); Commonwealth v. Henderson, 438 A.2d 951 (Pa. 1981); State v. Ucero, 450 A.2d 809 (R.I. 1982); State v. Grady, 286 N.W.2d 607 (Wis.App. 1979); *see* People v. McCray, 443 N.E.2d 915 (N.Y. 1982), *cert. denied,* 461 U.S. 961 (1983), (not mentioning *Wheeler* but rejecting the *Wheeler* approach); *cf.* Doepel v. United States, 434 A.2d 449 (D.C.App. 1981), *cert. denied,* 454 U.S. 1037 (1981), (judging *Swain* dispositive). Two of the courts expressly criticized *Wheeler* as effectively eliminating the peremptory challenge as a useful tool in assuring an impartial jury. Commonwealth v. Henderson, 438 A.2d 951; State v. Grady, 286 N.W.2d 607.[2]

*Wheeler* clearly represents the minority view. We decline to adopt the *Wheeler* reasoning, and we shall follow the rule in *Swain.*[3]

2. Appellant also argues that both the guilt and penalty phases of his trial were infected by prosecutorial misconduct at closing argument to the jury. We need not spell out the alleged instances of misconduct in detail: appellant acknowledged at oral argument that most of the instances of alleged misconduct were not objected to. Those that were are not individually or collectively sufficient to constitute reversible error. Some of the prosecutor's arguments which were not objected to do constitute misconduct; under the facts and circumstances of this particular case, however, and especially the strength of the evidence of guilt, we decline to consider the comments as plain error, and

---

[2]There has been criticism of the reasoning of the *Wheeler* court. *(See* S. Saltzburg & M. Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation,* 41 Md.L.Rev. 337, 359-60 (1982). It has been observed that *Wheeler* "has found surprisingly little support" and that "the overwhelming majority of courts still apply *Swain's* systematic exclusion test." Comment, *The Sixth Amendment: Limiting the Use of Peremptory Challenges,* 16 J.Mar.L.Rev. 349, 358 (1983).

[3]It has been suggested that since the prosecutor placed his reasons for exercising the peremptory challenges on the record, we should review those reasons in light of Weatherby v. Morris, 708 F.2d 1493 (9th Cir. 1983), *cert. denied,* 104 S.Ct. 719 (1984). In the absence of additional guidance from the Supreme Court of the United States, we decline to do so. If the nature of the motive underlying a peremptory challenge is deemed to affect due process or fundamental fairness, then the reviewability of motive should not depend upon such vagaries as whether the prosecutor happened to place his motives on record. Such a policy would allow a substantive right to be frustrated by mere silence or the refusal to cooperate. In any event, we are satisfied on the record that appellant's position cannot be validated even by the *Weatherby* standard.

conclude that no misconduct of the prosecutor warrants reversal of the judgment or the death sentence.

Notwithstanding our resolution of this issue, we are constrained to comment on some of the remarks made by the prosecutor during his argument to the jury. At one point, the prosecutor told the jury the state had a "right to have the defendant convicted." Of course, the state has no such right, only the obligation to dispense justice to its citizenry. Although not objected to, this remark clearly constituted misconduct. At other points in his arguments, the prosecutor identified himself with the victims, and at one point asked the jury to return the death penalty on behalf of "Rochelle Kinnamon, David and myself." This remark, also not objected to, constituted misconduct. We have had recent occasion to warn the prosecutors of this state that serious instances of misconduct will not be countenanced by this Court. McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984). Were the evidence of guilt and of the appropriateness of the death penalty in this case of a lesser order of magnitude, we may have had to reverse this judgment and sentence on the ground of the serious and wholly unnecessary misconduct of the prosecutor. We again admonish the district attorneys of this state to heed the warnings we expressed in *McGuire.*

Having determined that neither of the two issues directed to both the guilt and the penalty phases warrant reversal, we now turn to the assignments of error specifically pertinent to either the guilt or the penalty phases of appellant's trial.

### ISSUES PERTINENT TO THE GUILT PHASE

As noted, the essence of appellant's defense at the guilt phase was misidentification. In his cross-examination of Rochelle Kinnamon, appellant challenged the validity of her eyewitness identification of himself as the killer. At the conclusion of the guilt phase, appellant proposed an instruction specifically discussing the factors pertinent to the evaluation of eyewitness identification testimony. The district court refused the instruction, and appellant contends that this was error. We disagree.

Some courts have held that at least in certain circumstances, specific instructions on eyewitness testimony should be given. *See* United States v. Telfaire, 469 F.2d 552 (D.C. Cir. 1972); People v. Whalen, 451 N.E.2d 212 (N.Y. 1983). We adhere to the accepted view, however, that specific eyewitness identification instructions need not be given, and are duplicitous of the

general instructions on credibility of witnesses and proof beyond a reasonable doubt. United States v. Masterson, 529 F.2d 30 (9th Cir.), *cert. denied,* 426 U.S. 908 (1976); Sparks v. State, 96 Nev. 26, 604 P.2d 802 (1980).[4] *See also* United States v. Sambrano, 505 F.2d 284 (9th Cir. 1974). We therefore conclude that the district court did not err by refusing to give appellant's proposed instruction.

Appellant also argues that the district court erred by refusing to give an instruction that voluntary intoxication negated the specific intent to kill. *See* NRS 193.220. Appellant's argument ignores the fact that the jury could have predicated first degree murder liability on a felony murder theory, based in turn on the general intent felony of robbery. *See* Litteral v. State, 97 Nev. 503, 634 P.2d 1226 (1981). Thus, an instruction speaking to the negation of a specific intent to kill might not have affected the outcome of the guilt phase. Assuming *arguendo* that the jury focused on a theory of a premeditated killing performed with specific intent, we conclude that the failure to give the instruction was not error. It is true that voluntary intoxication may negate specific intent, and an accused is entitled to an instruction to that effect if there is some evidence in support of his defense theory of intoxication. *See, e.g.,* Williams v. State, 99 Nev. 530, 665 P.2d 260 (1983). Here, however, there was no evidence presented at the guilt phase to the effect that appellant was intoxicated at the time of the killing. The evidence showed only that he consumed intoxicants: David Nevius testified that the four men had a bottle of wine with them before the burglary, and that appellant had smoked marijuana. In order for a defendant to obtain an instruction on voluntary intoxication as negating specific intent, the evidence must show not only the defendant's consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings. *See* State v. Bourdlais, 70 Nev. 233, 265 P.2d 761 (1954) (decided under precursor of NRS 193.220); State v. Boyles, 537 P.2d 933 (Ariz. 1975); *see also* People v. Harris, 623 P.2d 240 (Cal.), *cert. denied,* 454 U.S. (1981). The instruction on voluntary intoxication was properly refused.

We have considered appellant's contention regarding the alleged ambiguity of the charging language of the indictment, and have found it to be without merit. Appellant's remaining issue pertinent to the guilt phase has been voluntarily withdrawn from our consideration.

---

[4]Appellant's attempt to distinguish *Sparks* is not persuasive.

## ISSUES PERTINENT TO THE PENALTY PHASE

Appellant first argues that the district court erred by instructing the penalty jury in part that "[a] verdict may never be influenced by sympathy, prejudice, or public opinion."[5] Appellant relies upon People v. Lanphear, 680 P.2d 1081 (Cal. 1984) and People v. Easley, 671 P.2d 813 (Cal. 1983). We do not believe the holdings in the California cases are controlling in the instant case for the reason that here the district judge fully advised the jury regarding the range of mitigating circumstances the jury could consider in sentencing Nevius.[6] As the California court in *Lanphear* said:

---

[5]The entire instruction is as follows:

Although you are to consider only the evidence from the trial and the penalty hearing in reaching a verdict, you must bring to the consideration of the evidence your everyday common sense and judgment as reasonable men and women. Thus, you are not limited solely to what you see and hear as the witnesses testify. You may draw reasonable inferences which you feel are justified by the evidence, keeping in mind that such inferences should not be based on speculation or guess.

A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law.

[6]The jury was instructed as follows:

Murder of the first degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:

1. That defendant has no significant history of prior criminal activity.
2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The victim was a participant in the defendant's criminal conduct or consented to the act.
4. The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.
5. The defendant acted under duress or under the domination of another person.
6. The youth of the defendant at the time of the crime.
7. Any other mitigating circumstance.

However, the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon Mr. Nevius. You should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But, you should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances (relating to the case or to the Defendant, Mr. Nevius), as reasons for not imposing the death sentence.

Here, as in *Easley,* the jury was not instructed that it could consider any aspect of the defendant's character or background in determining whether death was the appropriate penalty. Rather the extenuation instructions given suggested that only circumstances that lessen moral culpability are to be considered. That error was compounded by the repeated admonition that the jury should not be influenced by pity or sympathy for the defendant.

680 P.2d at 1083. Since the Nevius penalty jury was properly instructed to consider any mitigating circumstances offered by appellant, consistent with the requirements of Eddings v. Oklahoma, 455 U.S. 104 (1982) and Lockett v. Ohio, 438 U.S. 586 (1978), it was not error for the district judge to instruct the jury that they should not be influenced by sympathy, prejudice or public opinion.

Appellant also argues that his death sentence is suspect because the penalty jury failed to comply literally with the terms of NRS 175.554(3). That statute provides that a penalty jury "shall" return a written verdict of penalty, which "shall" designate the aggravating circumstances found and which "shall" state that there are no mitigating circumstances sufficient to outweigh the aggravators. In this case, the jury did return a written verdict listing the aggravating circumstances found, but the verdict did not formally recite the absence of mitigating circumstances sufficient to outweigh the aggravating circumstances.

Appellant argues that this failure to comply strictly with the mandatory terms of the statute renders the death sentence suspect; he argues that in capital cases particularly, penal statutes are to be strictly construed. He cites no authority for this argument except general constitutional principles. As respondent points out, the jury was properly instructed on the applicable law and was aware that if it found mitigating circumstances sufficient to outweigh the aggravating circumstances, it could not impose the death penalty. Moreover, the jury found no mitigating circumstances present in the case. Accordingly, we conclude that appellant was not prejudiced by any technical failure to comply fully with NRS 175.554(3).

Finally, appellant contends that the death penalty is unconstitutional under both the state and the federal constitutions. This contention is without merit. *See* Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979).

## PROPORTIONALITY REVIEW

NRS 177.055(2)(d) requires this Court to review a death sentence and determine whether the sentence is disproportionate to the penalty imposed in similar cases throughout the state, considering both the crime and the defendant. We have conducted a proportionality review of Nevius' death sentence, and have compared the facts of this crime and the background and characteristics of this defendant with those of similar cases in this state. Considering the egregious nature of the senseless killing in this case, given the fact that the murder occurred during the commission of three felonies perpetrated with the use of a deadly weapon, and given appellant's prior conviction of murder, we have concluded that the death sentence in this case is not disproportionate. *See* Deutscher v. State, 95 Nev. 669; Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979); Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985).

## CONCLUSION

We have found no merit to any of appellant's assignments of error and have concluded that the death penalty in this case is not disproportionate. Accordingly, we hereby affirm the judgment of conviction and the sentence of death.

SPRINGER, C. J., and GUNDERSON and STEFFEN, JJ., and FOLEY, D. J.,[8] concur.

---

[7]We have also conducted the separate "arbitrariness review" required by NRS 177.055(2)(c), and have concluded that the death penalty in this case was not imposed under passion, prejudice or any arbitrary factor.

[8]The Governor designated Hon. Thomas Foley, Judge of the Eighth Judicial District Court, to participate in this case. Nev. Const., art. 6, § 4.