THOMAS NEVIUS, Petitioner, *v.* WARDEN, NEVADA STATE PRISON, E. K. McDANIEL; and ATTORNEY GENERAL OF NEVADA, FRANKIE SUE DEL PAPA, Respondents.

No. 29027

THOMAS NEVIUS, Appellant, *v.* WARDEN, NEVADA STATE PRISON, Respondent.

No. 29028

June 24, 1998                                          960 P.2d 805

*Terri Steik Roeser,* Zephyr Cove; *Michael Pescetta,* Assistant Federal Public Defender, Las Vegas, for Petitioner and Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, Clark County, for Respondents.

## OPINION

*Per Curiam:*

In November 1982, over fifteen years ago, a jury convicted Thomas Nevius of murder in the first degree. He was sentenced to receive the death penalty. This court affirmed his conviction and sentence on direct appeal. *See* Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985). In August 1996, Nevius filed in this court an original petition for a writ of habeas corpus (Docket No. 29027), and an appeal from an order of the district court denying his petition for post-conviction relief (Docket No. 29028). Because of the similarity of the facts and issues involved, this court consolidated these matters for disposition.

On October 9, 1996, this court entered an order dismissing the appeal and denying the habeas petition. Nevius timely petitioned this court for rehearing and for leave to present oral argument. That petition remains pending and unresolved in this court.

Thereafter, Nevius moved this court to disqualify JUSTICE CLIFF YOUNG from participating in the decision of these matters. On August 28, 1997, this court issued an opinion denying the motion. *See* Nevius v. Warden, 113 Nev. 1085, 944 P.2d 858 (1997). On September 15, 1997, the clerk of this court received, but did not file, Nevius' instant motion seeking rehearing and

reconsideration of the decision of August 28, 1997, denying the motion to disqualify JUSTICE YOUNG[1].

Nevius asserts that the opinion of August 28, 1997, "contains material mistakes as to the facts and law and it would be in the interest of the justice for the court to reconsider its decision." Specifically, Nevius again argues that Attorney General Frankie Sue Del Papa's public endorsement of JUSTICE YOUNG during JUSTICE YOUNG's most recent re-election campaign creates an appearance of impropriety which would cause a reasonable person to entertain doubt as to JUSTICE YOUNG's impartiality in this matter. Further, Nevius again argues that he is entitled to discovery of the circumstances surrounding the attorney general's endorsement.

The opinion rejecting Nevius' motion to disqualify specifically relied on the reasoning set forth in State, Dep't of Transp. v. Barsy, 113 Nev. 709, 941 P.2d 969 (1997). *Barsy* rejected a similar contention and quoted at length from Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003, *cert. denied,* 493 U.S. 958 (1989). *Ainsworth,* in turn, concluded that an attorney's associations with a justice's campaign did not constitute legally competent grounds for disqualification under this state's statutes, rules of judicial conduct, or under the Due Process Clause of the United States Constitution. *Ainsworth* further held that where no legally competent grounds supporting a reasonable inference of bias existed, "summary dismissal" of the challenge was warranted and no evidentiary hearing or discovery was required. *Ainsworth,* 105 Nev. at 270, 774 P.2d at 1026; *see also* In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988) (where motion to disqualify justice stated no legally cognizable ground for disqualification, the motion was wholly insufficient as a matter of law to warrant a formal hearing).[2] This court's

---

[1]NRAP 35(d) provides in material part: "Serial motions or charges, whether entitled as separate challenges, or as supplements, or *entitled in any other way, must not be filed,* and will not be entertained." (Emphasis added.) Concerned that the instant motion might not comply with NRAP 35, the clerk of this court declined to file the motion and, instead, submitted it to the court for a determination of whether it should be filed. Although we entertain serious doubt about the motion's compliance with NRAP 35, in the interest of finally resolving this disqualification matter, we direct the clerk of this court to file the motion.

[2]In *Dunleavy,* this court also observed that if an attorney's contribution to a judge's campaign could constitute a reasonable ground for disqualification upon a challenge made *after the judge had ruled on the merits of a matter before the court,* "the conduct of judicial business in the courts of this state would be severely and intolerably obstructed." *Id.* at 790, 769 P.2d at 1275. We reiterate that JUSTICE YOUNG ruled on the merits of these matters on October 9, 1996.

decisions in *Barsy* and *Ainsworth* set forth more than adequate grounds for rejecting Nevius' request for disqualification and discovery.

In the instant motion, Nevius improperly reasserts and reargues matters previously considered and rejected by the court. Nevius has not pointed to any material matter of law or fact that was overlooked or misapprehended in the court's prior opinion; nor has he demonstrated that rehearing and reconsideration will promote substantial justice.

Accordingly, we deny the motion for rehearing and reconsideration and specifically reaffirm in its entirety the prior opinion of this court denying the motion to disqualify JUSTICE YOUNG.[3,4]

ROSE, J., concurring:

This is a motion for rehearing and reconsideration of our August 28, 1997, decision concluding that JUSTICE YOUNG was not disqualified from sitting on the motion to rehear this case. Our August 1997 decision did not revisit the merits of the case which had already been disposed of by an October 9, 1996 order dismissing appellant's appeal and petition for writ of habeas corpus. The dissent acknowledges these facts, but then proceeds to reconsider previously resolved issues which were not raised by the appellant's rehearing/reconsideration motion presently before this court.

The only rationale for JUSTICE SPRINGER's decision to revisit previously resolved and unraised issues is apparently his desire to take yet another shot at two of his perceived enemies—JUSTICE YOUNG and the Nevada Attorney General—both of whom opposed the action taken by JUSTICE SPRINGER (along with a departed member of this court) against the Nevada Judicial Discipline Commission.

JUSTICE SPRINGER demonstrated none of the high-minded conflict of interest principles stated in his dissent when he determined that even though an attorney and her law partner's aggregate election campaign contribution to a judge was over $100,000,

---

[3]The Honorable Peter I. Breen, Judge of the Second Judicial District Court, was designated by the Governor to sit in the place of JUSTICE SHEARING, for the purposes of deciding this motion only.

[4]The Honorable Merlyn H. Hoyt, Judge of the Seventh Judicial District Court, was designated by the Governor to sit in the place of JUSTICE CLIFF YOUNG, for the purposes of deciding this motion only.

this fact was insufficient to disqualify that judge from participation in the contested selection of the attorney to a State Bar committee. *See* O'Brien v. State Bar, 114 Nev. 71, 952 P.2d 952 (1998). The attorney involved in the *O'Brien* case is the former law clerk and personal friend of JUSTICE SPRINGER. JUSTICE SPRINGER has consistently refused to disqualify himself from participation in motions to disqualify me filed by this attorney, even though his close relationship with this attorney is well known, as is his animus toward me. *See* Whitacre Inv. Co. v. State, Dep't Transp., 113 Nev. 1101, 946 P.2d 191 (1997).

JUSTICE SPRINGER claims in his dissent that only a mere $10,000 contribution was involved in the *O'Brien* case. That is simply not true. When the contributions of the attorney whose election was challenged, Laura FitzSimmons, are added to those made by her husband and those made by or arranged by her law partner, we have close to $100,000 in contributions that were involved. FitzSimmons and her husband are listed as each contributing $10,000 in Judge Steve Jones' 1996 Campaign Disclosure Forms filed with the Nevada Secretary of State. Kermitt Waters admitted to making large additional contributions in a motion to disqualify JUSTICE YOUNG filed on December 16, 1996, in the *Whitacre* case. In that motion, Waters stated as follows: "Kermitt L. Waters, his wife Jan Waters, and Nevada corporations owned by Mr. Waters contributed substantially to Judge Jones' campaign. The approximate aggregate amount of campaign contributions from those sources is $75,000.000 [sic]. Ms. FitzSimmons and her husband, John Lambrose, each contributed $10,000 to the Steve Jones campaign." Whitacre Inv. Co. v. State, Dep't Transp., Docket No. 29401 (Appellant's Motion to Disqualify JUSTICE C. CLIFTON YOUNG at 4, December 16, 1996). By their own admission, Laura FitzSimmons and Kermitt Waters, with their spouses and through corporations they controlled, admit to contributing at least $95,000 to JUSTICE YOUNG's opponent in 1996.

When this appeal from the denial of a writ of habeas corpus and post-conviction relief was disposed of in October of 1996, the issue of the improper preemption of prospective black jurors was carefully considered and rejected by a unanimous court. After analyzing the claim, this court, including JUSTICE SPRINGER, rejected the appellant's racial assertion as being "not credible." Now, JUSTICE SPRINGER's opinion has shifted 180 degrees and he finds that those very same allegations present a compelling claim for summary reversal.

The only thing that has changed since our October 1996 resolution of this issue on the merits is that a motion to disqualify JUSTICE YOUNG has been denied; the disqualification motion

challenged JUSTICE YOUNG's participation in the rehearing of this case for the reason that the Attorney General had supported JUSTICE YOUNG in his re-election campaign. It is indeed alarming that JUSTICE SPRINGER is willing to abandon his decision in a death penalty case simply to continue his one-sided campaign of enmity against the Attorney General and a justice on this court.

The reason JUSTICE SPRINGER and the rest of this court found Nevius' allegations of racism in jury selection to be "incredible" is because they were raised many years after the racially repugnant statements were allegedly made, the prosecutor had no recollection of making any such statements and stated that he would not make such statements, and the state and federal district courts, in addition to the federal court of appeals all found that the peremptory challenges were exercised for a race neutral reason.

The prosecutor denied that he "racially stacked a jury" and, up until now, JUSTICE SPRINGER agreed that the evidence did not support such claims. JUSTICE SPRINGER's new-found conviction that a black man is being executed because of the verdict of a "stacked jury" represents yet another effort in his quest to vilify his perceived long-standing enemies.

Regrettably, JUSTICE SPRINGER's latest attacks do nothing more than discredit himself and our beleaguered judicial system.

SPRINGER, C. J., dissenting:

The issue presently before the court is, as pointed out in the concurring opinion, whether JUSTICE YOUNG may properly sit in judgment of Nevius' death sentence. I am unable to address this issue adequately, however, without first drawing attention to the overriding issue in this case, which is whether Nevius' death sentence must be set aside by reason of the prosecutor's having "stacked" the jury by deliberately excluding black people from Nevius' jury.[1]

To get to the heart of the matter: We have before the court a representation by a member of the bar, an officer of this court, that the prosecutor admitted to having deliberately excluded black people from the Nevius jury and to having done "a good job of

---

[1]Nevius, who is black, presents evidence that his prosecutor said to his defense attorney about the jury selection process: *"You don't think I want all those niggers on my jury do you?"* The prosecutor does not expressly deny making this statement but, rather, claims not to "recall" using the word, "nigger," claiming further that if he did use that word it was only because the defense attorney used it first. Whether the prosecutor used the offensive word or not, there is credible evidence that the prosecutor was trying to "stack" the jury racially and that he admitted to defense counsel that he "did a good job of it."

it." The majority continues to maintain, incorrectly, I think, that the defense attorney's charges of impermissible racial discrimination are "incredible" and that they need not be considered by the court.[2] It is now clear to me that the uncontradicted report of the prosecutor's racist comments must not only be considered by the court but must be taken as mandating the reversal of the death penalty judgment.

There is presently pending before the court Nevius' motion to reconsider and vacate previous rulings in this case which reject his claims of racially-discriminatory jury stacking by the State. To me, the necessity for granting Nevius' motion on these grounds is now clear. The pressing constitutional issues awaiting final disposition by this court render even more compelling Nevius' pending request that JUSTICE YOUNG be removed from the case. JUSTICE YOUNG's remaining on the case, given his alliance with the Attorney General and his "tough-on-crime" campaign stance creates an appearance of impropriety that is magnified by reason of the race-related constitutional issues advanced by Nevius.

It is true, as stated in the concurring opinion, that the majority opinion addresses only issues relating to whether or not a challenged justice should continue to sit in judgment of this case; but, as I have said, this justice's qualifications cannot be adequately addressed without considering the very critical race-discrimination issue at the heart of this case. What this case is really all about is whether Nevius, a black man, must go to his death by verdict of a jury that was chosen in a manner that appears to have involved the deliberate exclusion of jury members of his race.[3] Because this is the case, greater scrutiny must be given to the disqualification issues at hand.

---

[2]This court is not, of course, competent to make judgments about a witness's credibility. Under our constitution the supreme court is empowered to decide only questions of law, not fact. Nev. Const. art. 6, § 4; NRS 175.025. Even if the court had the power to rule that Nevius' attorney was misrepresenting his conversation with the prosecutor, there is absolutely no justification for the court's ruling on defense counsel's credibility in this case. Even if this were not the case, there is no cause for believing that counsel is not telling the truth.

[3]My calling attention to the racist aspects of this case has provoked a remarkably extravagant concurring opinion. According to the concurrence, my proceeding to "reconsider previously resolved issues" of racial discrimination in the jury selection process is not only impermissible, it is charged to have been motivated by my supposed "enmity" and "animus" toward other justices of this court. I have a very hard time trying to understand what it is about my discussion of the vital racial-discrimination question that would prompt my brother ROSE to say that I raise this issue just to "take yet another shot at three of [my] perceived enemies." I do not understand how a necessary discussion of the racial issues that haunt this case can possibly be seen as being a "shot" at anyone.

More and more frequently this court is being presented with claims of error arising out of racial abuses employed by prosecutors during the jury selection process. In these cases we find prosecutors presenting one kind of excuse or another for their actions, claiming that their practice of removing minorities from juries is based on "racially neutral" grounds. The prosecutor's saying in this case that he got rid of "all those niggers" on the jury and saying that "he did a good job" of doing so can hardly be claimed to be racially neutral; and I think that it is time at last that this court put a stop to what is seen by some as rampant racial bias in the criminal justice system in this state.

Nevius claims that JUSTICE YOUNG's close political alliance with the Attorney General and expressions of bias in criminal cases create an appearance of impropriety that should disqualify the justice from sitting in judgment in this case. It is not, of course, necessary for Nevius to demonstrate that JUSTICE YOUNG has an actual bias in favor of the Attorney General or in favor of affirming death-sentence cases. Nevius has only to convince the court that to an outside observer there *appears* to be bias on the part of JUSTICE YOUNG. My position in this dissent is not that Nevius has demonstrated actual bias on the part of JUSTICE YOUNG but, rather, that the factual averments upon which Nevius relies rather clearly show an unacceptable appearance of bias.

Nevius' claims of bias are partially based upon JUSTICE YOUNG's close political alliance with the Attorney General, an alliance that arose while his appeal was pending. Nevius complains that the Attorney General gave to JUSTICE YOUNG in the last election what JUSTICE YOUNG himself described as a "particularly important" contribution, namely, the Attorney General's public endorsement of JUSTICE YOUNG's candidacy over that of another jurist. It is commonly believed that JUSTICE YOUNG owes his election success to the Attorney General's public endorsements of his candidacy; and Nevius argues that the contribution is of such "importance" that JUSTICE YOUNG can no longer sit in impartial judgment in this case.

JUSTICE YOUNG and JUSTICE ROSE in a recent dissenting opinion, O'Brien v. State Bar of Nevada, 114 Nev. 71, 952 P.2d 952 (1998), have expressed their view that where a political "contribution is very large or greatly disproportionate to the contributions made by a similar class of contributors then an appearance of impropriety should be recognized." *Id.* at 79, 952 P.2d at 957. Such "disproportionate" contributions, according to JUSTICE YOUNG himself, not only create the impression of impropriety, they create a judicial atmosphere that is "fundamentally unfair" and require that decision-makers "with [such] conflicts of interest not participate" in the decision. *Id.* at 78-80, 952 P.2d at 957-58. If we are to accept the position taken by JUSTICE YOUNG in

*O'Brien,* then Nevius presents a very credible argument that the Attorney General's public endorsement is a far greater and more "disproportionate" contribution to JUSTICE YOUNG than the mere $10,000.00 involved in the *O'Brien* case.

In support of his motion, Nevius cites to American Bar Association documents relating to the "legitimate concern about a judge's impartiality" that is present when "lawyers who represent such parties are known to have made contributions to election campaigns of judicial candidates." The ABA Commentary to 5(C)(2) of the Code of Judicial Conduct states:

> [C]ampaign contributions of which a judge has knowledge, made by lawyers . . . who appear before the judge may by virtue of their *size* and *source,* raise questions about a judge's impartiality and *be cause for disqualification* as provided under Section 3(E).

(My emphasis.) One can certainly understand Nevius' "legitimate concern about [JUSTICE YOUNG'S] impartiality."

The *source* of the campaign contributions here (the State's Attorney General, who issued an unprecedented and "important" public, political endorsement of JUSTICE YOUNG over another jurist) and the *size* of the contribution (characterized by JUSTICE YOUNG himself as being "particularly important" to his campaign endeavors) appear to me of such a nature as to "raise questions about a judge's impartiality and be cause for disqualification."

Nevius also claims that, in addition to forming a close and "important" alliance with the State's chief prosecutor, JUSTICE YOUNG has, while the present case has been pending, publicly taken such a pro-prosecution, anti-accused stance as to make it impossible for JUSTICE YOUNG to sit in impartial judgment of Nevius' case. For example, not only did JUSTICE YOUNG describe himself in campaign advertisements as a judge who was "tough on crime,"[4] he presented himself as being a judge who had a

---

[4] "Tough-on-crime" claims by judges are sometimes overlooked as being merely campaign puffing; but a judge's claiming to be a judicial crime-fighter is, arguably, in a different category. The problem with "tough on crime" statements and boasting of a "record of fighting crime" is that such statements carry the implication that the judge would act in a biased manner (that is, in favor of the state) in criminal cases. In Washington, a judge was censured for campaign statements that he was "tough on drunk driving." In re Kaiser, 759 P.2d 392, 394-96 (Wash. 1988).

For a general discussion of the failure of our judicial discipline machinery to deal with campaign misconduct and other serious judicial misconduct see Whitehead v. Comm'n on Jud. Discipline, Table of Disciplinary Oversights, Concurring Addendum to Order Granting Petition (No. 24598, October 28, 1994). Getting elected to judicial office seems to create an immunity against

"record of fighting crime" and supported his judicial crime-fighting record by claiming that he had "[voted] to uphold [the death penalty] 76 times." Judges should be judging crime not "fighting" crime.[5] Given the narrowness of JUSTICE YOUNG's election victory, it is certainly reasonable for Nevius to maintain that JUSTICE YOUNG owes his position on this court to his political alliance with the Attorney General and to her unprecedented, ethically-suspect endorsement of his candidacy.

This court should examine critically the appearance of bias inferable from JUSTICE YOUNG's crime-fighting stance and from the important political debt owed by JUSTICE YOUNG to the Attorney General. Such critical examination would demonstrate, I maintain, bias of a sort that demands the disqualification of JUSTICE YOUNG.

---

discipline proceedings relating to a judge's unethical campaign practices; but this does not mean that convicts condemned to death are not entitled to complain of bias based upon a judge's pro-prosecution campaign boasts.

[5] I commend to the reader of this opinion a well-written and pertinent law review article entitled, "Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases," by Stephen B. Bright and Patrick J. Keenan. 75 B.U. L. Rev. 759 (1995). The article expresses concern that judges in capital cases may be "too responsive" to a political climate in which judges who wish to remain as judges must "constantly profess their fealty to the death penalty." *Id.* at 760 (citations omitted). The authors compare the pressures facing judges who decide capital cases to the kind of danger that "confronted the judges beholden to King George III." *Id.* The article concludes by urging that it is time for open and honest discussion of the political pressures on judges who must stand for election.

> The integrity, credibility, and legitimacy of the courts are at stake. Judges themselves should lead the discussion by disqualifying themselves, *sua sponte* from cases in which they recognize that political considerations may keep them from holding the balance "nice, clear and true." But it may be necessary for lawyers to prompt the discussion by filing motions for recusal in cases in which such pressures are present. The judiciary and the bar have a duty to explain to the public the difference between the representative function of legislative bodies and the adjudicatory function of the courts.

*Id.* at 834-35 (citation omitted).