ANNE ROBIN WALCH, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 25824

January 4, 1996                                        909 P.2d 1184

*James J. Jackson*, State Public Defender, and *Robert E. West*, Deputy Public Defender, Carson City, for Appellant.

---

*Frankie Sue Del Papa,* Attorney General, Carson City; *Noel S. Waters,* District Attorney, and *Egan K. Walker* and *Anne E. Langer,* Deputy District Attorneys, Carson City, for Respondent.

# OPINION

By the Court, Rose, J.:

Nell Laird (Nell), an elderly woman, gave a durable power of attorney to appellant Anne Robin Walch. In handling Nell's financial affairs, Walch opened two joint accounts in her and Nell's names into which she placed the bulk of Nell's funds. Walch wrote a number of checks on these two accounts which she spent for her and her family's benefit. She also deposited some of Nell's funds directly in her own account and cashed checks made out to Nell. The State prosecuted Walch for theft. At her trial, she maintained that Nell allowed her to borrow the funds in question and that she intended to pay them back. Nell was not competent to testify. The jury found Walch guilty.

On appeal Walch raises two issues for the first time. She argues that as joint owner of the funds in the two accounts, she had lawful authority to withdraw them and could not be guilty of theft. She also argues that the amount of restitution ordered by the district court was arbitrary and improper. We conclude that

these arguments are not persuasive and affirm the judgment of conviction.

## FACTS

Nell is an elderly resident of Carson City in her nineties. Ron Machado is a friend of Nell's who lives with her and assists her in her daily life. In early 1990, Machado was severely beaten at home by three intruders and left somewhat disabled physically and mentally. Shortly after that, Darlene Roullard, a CPA, began handling both Nell's and Machado's financial affairs. Machado became dissatisfied with Roullard. He told Walch, a friend of his, about this, and they agreed that Walch would assume control of his financial affairs.

On December 20, 1991, Nell executed a document providing Walch with a durable power of attorney for her. The document expressly precluded Walch from using Nell's assets for Walch's "own legal obligations, including but not limited to support of the agent's dependents." On that same day, Walch received the bulk of Nell's funds, approximately $11,000.00, from Roullard. Walch deposited $2,000.00 from this $11,000.00 into her personal account on December 23, 1991. She did this by endorsing Nell's name on a check drawn from an account held by Nell and Machado.

With the remaining sum of approximately $9,000.00, Walch opened a joint account for her and Nell at First Interstate Bank (FIB) on December 24, 1991. Nell herself signed the check for this deposit. Walch applied for and received an ATM card with the account. She listed herself as Nell's "guardian" on the application. Walch changed this FIB account to a trust account, to which only she had access, on January 8, 1992. Walch also opened a second joint account for her and Nell at Bank of America (later U.S. Bank) with an additional $1,950.00 which she had earlier received from Nell. (This account and the FIB account are referred to as "the two accounts.") She later lied to a sheriff's detective and told him that this money had come from the $11,000.00 first received from Roullard.

Machado had given a power of attorney to Walch as well. He became irritated with Walch and formally revoked this power. On March 13, 1992, Machado also had Nell execute a revocation of Walch's power of attorney and place that power in him. Machado said Walch knew of the revocation within a week or so. Walch said she learned of it around August 1992. However, she continued to tell a number of people, including a realtor, social worker, and assistant sheriff, that she had such power because she continued to handle Nell's and Machado's affairs despite the revocations.

In September 1992, Nancy Hunter, a State of Nevada social worker, received a report that Nell might not be properly cared for. Hunter visited Nell at home and spoke with her and Machado. She found no major problems and decided to wait and monitor the situation. Hunter spoke to Walch on the phone the next day. Walch informed Hunter that she was the guardian of both Nell and Machado.

In October 1992, Hunter received a report that Nell was very upset because her house was being sold. Hunter went to Nell's home and found that this was true. She subsequently met with Walch and discussed the matter. Walch told her that the plan was to sell the house and buy a bed and breakfast in Virginia City, where Nell would live, Machado would conduct tours, and Walch and her husband would run the bed and breakfast and a catering business. Hunter informed Walch that she thought such a move would not benefit Nell either personally or financially. Hunter asked Walch to meet with Dennis Green, an assistant sheriff who acted as a public guardian for the consolidated municipality.

Green, Hunter, and Walch met at Nell's on October 19, 1992, to discuss Walch's relation and actions in regard to Nell. Initially, Walch indicated she held some kind of guardianship but later backed off from that position and said she held a power of attorney for Nell. A day or two later at Hunter's office, Walch provided Hunter with some legal documents, apparently regarding her power of attorney. Hunter gave Walch guidelines for guardians used by Washoe County courts. Later that day, Walch returned to Hunter's office and said she had looked at the guidelines and needed to clear things up. Walch said she did not want to get arrested in front of her children and indicated that she had taken more than $10,000.00 from Nell. Walch never told Hunter that the money was taken as a loan or with Nell's permission.

Machado testified that Walch made a similar admission to him around the same time. However, she told Machado that she had intended to repay the money when her husband received a disability settlement, but no settlement had been made.

The assistant sheriff, Green, attempted to meet with Walch after her admission to Hunter, but Walch never went to the sheriff's department to meet him. Green discovered that Nell's finances were in a "shambles." She was behind in her property taxes, water bill, telephone bill, and medical bills, her 1991 income taxes were not filed, and her FIB account was overdrawn. In October 1992, Nell's monthly income was about $1,980.00. By March 15, 1993, with Green helping to manage Nell's affairs and after paying off the overdue bills, they had accumulated about $3,000.00.

On the morning of December 8, 1992, Joe Strande, a sheriff's

detective, executed a search warrant at Walch's home. Walch cooperated and provided him with a tray of documents relating to Nell's finances. Strande also possessed a warrant to arrest Walch, but did not serve her with it. He asked her to go to the sheriff's office, and she did so that afternoon. Strande read Walch her *Miranda* rights and interviewed her, reviewing a number of the documents with her. Walch identified dozens of checks drawn on the two accounts, totaling $11,009.28, which had been used for the benefit of her and her family. Strande testified that Walch said she felt she had overextended her authority in doing this and that Nell was not capable of understanding how much of Nell's money she had used. Walch told Strande that she considered the money to be a loan and that she would pay it back when her husband received his social security disability. She also maintained that Nell gave her permission to use the money if she needed it and that she told Nell when she did so.

Walch was subsequently arrested and received a jury trial. Nell never testified because the district court examined her and found her incompetent to testify. Walch testified that in return for her services to Nell and Machado, Nell allowed her to borrow money for her family's needs. She planned to repay Nell from her husband's settlement. She never borrowed money without Nell's authorization, and she deposited checks payable to Nell into her own account only with Nell's permission. Walch wrote four checks from her own account and deposited them into the two accounts, allegedly to repay borrowed money. She denied ever telling Hunter, the social worker, that she had a guardianship over Nell.

Other relevant evidence included the following. Walch deposited a number of checks, either drawn on the two accounts or payable to Nell, directly into her and her husband's account. Walch admitted to closing out a money market account held by Nell, totaling about $2,700.00. However, she claimed that she sent the money in the form of a check to Machado as an emergency loan, even though the bank records showed the money had been taken in cash. Walch withdrew about $1,900.00 in ATM transactions from the FIB account in January and February 1992; apparently some of this money was spent for Nell and some for Walch's family.

In regard to Nell's mental acuity during the period that Walch had access to Nell's assets, the evidence varied. Roullard, the CPA, testified that when she handled Nell's finances, Nell thoroughly understood her income and how funds were being spent. Machado and the realtor believed that Nell understood what she was doing when she signed the documents for the sale of her house. However, no one disputed that Nell was extremely upset

and agitated by the prospect of a sale when two weeks later the realtor brought people into the house to view it. The notary public present when Nell executed the power of attorney in favor of Walch testified that Nell read and understood the documents. Dr. Bruce Gray testified for Walch. He detected no dementia when he treated Nell as late as March 1992. In September 1992, Hunter, the social worker, concluded Nell "was impaired in her understanding of things and that she needed care." Walch at one point told Detective Strande that Nell was not capable of understanding how much of Nell's money Walch had used.

The jury found Walch guilty of felony theft. Walch was sentenced to five years in prison. The sentence was suspended, and she was placed on probation. As a condition of probation, she was to serve six months in jail. Restitution in the amount of $14,646.32 was also ordered.

## DISCUSSION

*Whether as a matter of law Walch could not be guilty of theft because she owned the funds in the two accounts as a joint tenant*

At trial, Walch's defense theory was that Nell had knowingly authorized Walch's use of the money to benefit her family. The jury rejected it, and there was more than substantial evidence to support a finding that Nell did not authorize Walch's use of the money in this way. For the first time on appeal, Walch argues that as a party to the two accounts, which were opened as joint accounts with Nell, she had lawful authority to withdraw any or all of the funds from those accounts. Walch did not offer an instruction along these lines and did not object to the instructions on theft given to the jury.

Ordinarily, if a party fails to raise an issue below, this court need not consider it on appeal. Montesano v. Donrey Media Group, 99 Nev. 644, 650 n.5, 668 P.2d 1081, 1085 n.5 (1983). However, if as a matter of law Walch could not be convicted of theft in this case, her conviction would be patently prejudicial error which this court should redress. Libby v. State, 109 Nev. 905, 911, 859 P.2d 1050, 1054 (1993).

NRS 205.0832 provides in pertinent part:

A person commits theft if, *without lawful authority,* he knowingly:

1. Controls any property of another person with the intent to deprive that person of the property.

2. Converts, makes an unauthorized transfer of an interest in, or without authorization controls any property of

another person, or uses the services or property of another person entrusted to him or placed in his possession for a limited, authorized period of determined or prescribed duration or for a limited use.

(Emphasis added.) If the value of the property stolen was greater than or equal to $250.00, the theft is a felony. NRS 205.0835.

Walch argues that funds deposited in the two accounts became her and Nell's joint legal property and that she therefore had lawful authority to withdraw them and use them as she wished. To support this argument, Walch cites authority such as NRS 100.085(1) and Walnut Valley State Bank v. Stovall, 574 P.2d 1382, 1384 (Kan. 1978). She further notes that the transfer of solely owned property to oneself and another as joint tenants may be manifested by a signed account signature card. Weinstein v. Sodaro, 91 Nev. 638, 640, 541 P.2d 531, 532 (1975).

None of this authority establishes that Walch's status as a joint account holder shields her from liability for theft in this case. The effect of NRS 100.085(1) is to protect a depository, such as a bank, from liability if it pays money out to a joint tenant of an account.[1] *Stovall* involved the validity and effect of a garnishment order on a joint account held by a debtor and her spouse. *Sodaro* determined whether or not a joint account with rights of survivorship was created. Walch does not show how any of this law affords immunity to her as a joint tenant in a criminal prosecution for theft.

In effect, Walch urges this court to adopt the following view. Her role as a fiduciary toward Nell, which her power of attorney placed her in, was wholly distinct from her role as joint legal owner of the funds in the two accounts, which were created after the power of attorney was conferred. Although her power of attorney precluded her use of Nell's funds for her own benefit, it authorized her to place those funds into the two accounts.[2] Thereafter, in dealing with the funds, she no longer acted in her capacity as Nell's attorney in fact, with its attendant limitations, but in an unlimited capacity as joint legal owner of the account funds. If we accepted Walch's view that her role as owner was distinct from and trumped her role as attorney in fact in regard to the account funds, absolutely no legal constraint would prevent her from diverting Nell's funds to her own use regardless of the

---

[1]NRS 100.085(1) provides that money deposited in the name of multiple parties may be paid to any one of the persons named and that such payment "is a valid and sufficient release and discharge of the depository."

[2]Walch continued to handle Nell's assets even after formal revocation of the power of attorney. After this revocation, Walch's lack of authority to funnel Nell's funds into the two accounts for Walch's own eventual use is even more obvious.

consequences to Nell. Walch admits to a civil obligation to repay Nell, but under her view, even if she had taken the money from the two accounts without Nell's knowledge and without any agreement to repay it, she would have acted lawfully as joint owner of the funds. We, of course, reject such a view.

Because Walch was charged under NRS 205.0832, we need not struggle with technical distinctions between embezzlement, larceny, and other similar offenses, as long as the State charged the appropriate subsection or subsections of the statute. Enacted in 1989, NRS 205.0832 consolidates all such kindred offenses under the rubric of theft.

> Under such statutes the elements of the several offenses have not been changed, but the distinctions between the offenses are not important in a prosecution for theft, and it is not necessary to decide whether the offense committed was technically a larceny or an embezzlement, since accused may be convicted of theft on proof of the commission of any of the acts denounced in the statute.

29A C.J.S. *Embezzlement* § 2 (1992) (footnotes omitted).

In applying its own state's consolidated theft statute, the Arizona Supreme Court stated:

> The obvious purpose in enacting this "omnibus" theft statute was to eliminate technical distinctions between various types of stealing and to deal with all forms in a single statute, thus simplifying prosecution for the unlawful "acquisition" of property belonging to others. A restrictive interpretation of the statute would thus conflict with the legislative objective by reinstating the technical, common law restrictions and definitions which the legislature sought to eliminate.

State v. Tramble, 695 P.2d 737, 741 (Ariz. 1985) (citation omitted).

The Kansas Supreme Court agreed that "the primary purpose of the consolidated theft statute was to eliminate the complexities of pleading and proving the vague historical distinctions in the various types of theft." State v. Saylor, 618 P.2d 1166, 1169 (Kan. 1980). However, if the prosecutor is unsure "as to what the evidence will disclose at trial, the correct procedure is to charge the defendant in the alternative under those subsections to [the consolidated theft statute] which may possibly be established by the evidence." *Id.* at 1171. This procedure ensures that the defendant's defense is not prejudiced. *Id.*

In this case, Walch was charged under NRS 205.0832(1) and (2). We conclude that the jury properly convicted her under either or both of these subsections.

In regard to monies which Walch took from the two accounts for her own use, the jury could have properly found that Walch acted without lawful authority when she placed Nell's funds into the two accounts in the first place. It could have concluded that Walch placed Nell's funds into the two accounts with the intention of withdrawing them later for her own benefit. If so, Walch's felonious intent and actions commenced before such monies reached the two accounts, and her status as a joint legal owner of the account funds would not shield her from culpability for theft of funds subsequently withdrawn and misused. In addition, Walch several times took money from Nell which was not in either of the two accounts. In regard to either conduct, the jury could have found that Walch knowingly and without lawful authority controlled Nell's funds intending to deprive her of the funds, a violation of NRS 205.0832(1). In regard to either conduct, the jury could also have found that Walch knowingly and without lawful authority used Nell's funds entrusted to her or placed in her possession for a limited use, a violation of NRS 205.0832(2).

We conclude that Walch's mere status as a party to the joint accounts did not provide her with lawful authority to use Nell's assets for her own benefit and therefore did not preclude her conviction for theft.

*Whether the district court imposed an arbitrary amount of restitution on Walch*

The district court ordered Walch to pay restitution in the amount of $14,646.32. This was apparently the figure recommended by the Division of Parole and Probation in the presentence report. At the sentencing, the prosecutor told the court that if it liked he could point to the exhibits admitted at trial which would substantiate that amount. He called it "a conservative figure based on the monies that the defendant identified to Detective Strande and the monies which were identified to the jury through cross-examination and through bank records, witnesses, as monies clearly removed from the victim's account and consumed by the defendant, or placed into her own account." At no time did Walch question or object to this amount. Her counsel informed the court that he and Walch had reviewed the presentence report and had no material errors to correct. He asked the court to grant Walch probation with "conditions that the Court considers appropriate, including restitution in such an amount as the Court finds just in this case, having heard all the evidence."

Walch now contends that this amount of restitution was arrived at without a clear basis and that nothing in the record indicates

which monies the jury considered stolen. She claims that the amount is so arbitrary that it violates due process. However, she does not analyze the record in any way to show that the amount is excessive. The asserted error is neither plain nor constitutional in magnitude. Therefore, since Walch failed to raise this issue below, this court need not consider it now. Montesano v. Donrey Media Group, 99 Nev. 644, 650 n.5, 668 P.2d 1081, 1085 n.5 (1983). The claim lacks merit anyway, since the record supports a finding that the amount of the theft exceeded $14,646.32. Therefore, the district court did not err in ordering restitution in the amount of $14,646.32.

## CONCLUSION

Walch's status as joint holder of the two accounts did not preclude the jury from finding that she stole funds which passed through the accounts. Moreover, the record showed that she took funds from Nell that never even passed through the two accounts. The amount of restitution ordered was not arbitrary, but supported by the record. We therefore affirm the judgment of the district court.

STEFFEN, C. J., and YOUNG and SHEARING, JJ., concur.

SPRINGER, J., dissenting:

The trial judge readily saw what was wrong with this case: "[T]he case was tried as an embezzlement case, but the information was a theft information . . . ." This is really about all that has to be said; Walch might have been an embezzler, but she was charged with and convicted of larceny.

Walch was accused under the "theft" statute, NRS 205.0832, which has two subparagraphs. Subparagraph 1 is the larceny paragraph and relates to a person who "*[c]ontrols* any property of another person with *the intent to deprive* that person of the property." Subparagraph 2 is the embezzlement paragraph and relates to a person who "*[c]onverts* . . . property of another person *entrusted* to him . . . ." (My emphasis.)

The charging document relates only to the larceny paragraph, subparagraph 1, and charges that the defendant "*controlled*" a certain person's property "with the intent to deprive her of that property," traditional larceny parlance, except for the word "controlled,"[1] which the legislature chose to use in place of the

---

[1] "Control" is a broader, if vaguer, term than the crisp and directive terms "taking" and "carrying away." Under the present statute, "'[c]ontrol' means to act so as to prevent a person from using *his own* property . . . ." NRS 205.0823 (Emphasis added). Like taking and carrying away another's property, preventing a person from using his or her "own property" is in

traditional language of larceny, "steals, takes and carries away," when the crime of theft was added to the NRS in 1989.

If a crime has been committed here, the crime is necessarily that of embezzlement as defined in subparagraph 2 of NRS 205.0832. Embezzlement is committed by one who *converts* the property of another after having been *entrusted* with another's property. At most, Walch is guilty of converting property that was entrusted to her—the crime of embezzlement. Walch was not charged with embezzlement. She was not charged with converting property entrusted to her, even though, as remarked by the trial judge, "the case was tried as an embezzlement case."

If it had chosen to do so, the legislature could have, instead of setting out the two different crimes in two different paragraphs, merged larceny and embezzlement into one overarching offense. As an example of this kind of legislation, the English Theft Act of 1968 provides that any person "who dishonestly appropriates the property of another" is guilty of "theft." Under this kind of statute, the crimes of larceny and embezzlement are merged and become one. Such is not the case here; and Nevada's theft statute retains, in two separate paragraphs, the distinction between taking *from* possession (larceny) and taking *while* in possession (embezzlement).

Walch was charged with larceny (NRS 205.0832(1)); yet, the only crime that is supported by the evidence is that of embezzlement (NRS 205.0832(2)). If Walch did anything morally or legally wrong, it was in converting money entrusted to her and lawfully in her possession, as stated in the embezzlement statute, "without authorization." The two crimes, defined in two separate paragraphs, are quite different in their scope; and, certainly, Walch should not be expected to defend against a larceny charge when the only possible crime involved here was, as recognized by the trial judge, that of embezzlement. Walch's larceny conviction should be set aside.

---

essence a trespass and an invasion of another's property rights. Subparagraph 1 of NRS 205.0832 is still, essentially, a larceny statute. There was certainly no trespass here, as both the defendant and the alleged victim, Nell Laird, were joint owners of the money, and Walch did not prevent Laird in any way from using her "own property." Both Walch and Laird had legal "control" of the money in question. This is, of course, the reason that, necessarily, "the case was tried as an embezzlement case."