OPINION
 
 [1]
 

 Per Curiam:
 

 Early in the morning on May 5, 1998, appellant Tyrone Lafayette Garner drove Charles Randolph to a bar in Las Vegas. Randolph entered the bar, shot the bartender to death, and stole cash and video equipment. After a jury trial, Garner was convicted of conspiring to commit robbery, first-degree murder with use of a deadly weapon, and three other crimes. Garner contends that: there was insufficient evidence to convict him; the State improperly commented on his attempt to negotiate a deal with police; and the jury instructions on voluntary intoxication, conspiracy, and deliberation and premeditation were erroneous. This appeal also presents the issue of how this court’s recent decision, Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000), should apply to convictions which are not final but were entered before
 
 Byford
 
 was decided.
 

 FACTS
 

 Just before midnight on May 4, 1998,
 
 [2]
 
 John Shivell started the graveyard shift as a security guard at Angel Park Apartment complex in Las Vegas. The guard shack was at the front of the complex, and Doc Holliday’s, a bar, was immediately to the west. Shivell parked his car in the parking lot at Doc Holliday’s where he could see it from the guard shack. Around 1:00 a.m. (May 5), Shivell heard a “sharp barking-type laugh” coming from two men who were approaching a car parked near his own. The men’s car was facing the bar and had a view of the bar’s two entrances and the entrance to the parking lot. The man approaching the passenger side of the car appeared to be stockier than the one on the driver side, and the two seemed to be conversing as they got in the car. The car then started up, pulled away without its lights on, and went behind Doc Holliday’s, where the lights came on. The
 
 *775
 
 car turned south on Durango Drive and then east on Westcliff Drive, passing by Shivell and the guard shack. He identified it as an older model Cadillac. He saw two occupants, but thought there might have been a third because there seemed to be “a hump” behind the driver. Shivell decided to call Doc Holliday’s. He got no answer, dialed again, and again got no answer. He then called the police, who arrived about ten minutes later.
 

 Inside Doc Holliday’s, Las Vegas Metropolitan Police found Shelly Lokken, the bartender, handcuffed and lying face down in the bar’s cooler with two gunshot wounds to the head. A deformed bullet and a 9-millimeter cartridge case were on the floor of the cooler. The manager at Doc Holliday’s found that the bar’s security videocassette recorder (VCR) and multiplexer were gone. (A multiplexer allows multiple views to be monitored on a single screen.) Cash totaling $4,629.00 had been taken from the safe, cash register, and gaming drawer.
 

 JoAnn McCarty was a major witness for the State. On the evening of May 4, she and other persons, including Charles Randolph and appellant Garner, were smoking crack cocaine at a trailer in Las Vegas. Gamer and Randolph did not have money or cocaine so McCarty shared some of her own cocaine with them. Garner and Randolph also got some cocaine on credit from another person, Jay, but when they asked for more, Jay refused. About ten minutes after this refusal, Garner and Randolph left the trailer in Garner’s Cadillac.
 

 The two men returned to the trailer a couple of hours later. McCarty noticed that they were “hyper.” They had also returned with crack cocaine and money. McCarty estimated that Randolph had a bag holding two hundred to five hundred dollars’ worth of cocaine. Garner had less, maybe two hundred dollars’ worth. Gamer also had a lot of small bills of money, folded and tied with a rubber band. Randolph said he had got money from his attorney and loaned some to Gamer. According to McCarty, Gamer “just kept pulling it and putting it in his pocket, pulling it out, putting it in, putting—you know, like he had never had money before. It was just kind of weird.” Garner also asked if anyone there wanted a VCR.
 

 McCarty and another woman then left with Garner and Randolph in Gamer’s Cadillac. They were getting high and being loud when Garner said to quiet down because there was “heat” in the car. He told McCarty that there was a gun at her feet. McCarty looked down and saw a white plastic bag with a gun in it. They then drove to a motel, where Garner went in and registered while the other three waited at the car. He came back, wrapped the bag holding the gun in a towel, took it upstairs to their motel room, and placed it behind the toilet tank. McCarty testified that the four then “got high, partied, had fun, just took
 
 *776
 
 showers, some got naked, a few sexual activities.” Both men “had lots of money,” which they shared with the women. Randolph even gave money to Garner. Randolph and McCarty prepared to go to the closest casino and gamble, and he gave her two or three hundred dollars. Randolph never made it out the door with McCarty, however. He looked “kind of spooked” so McCarty walked to the casino alone. She gambled for about an hour, but when she returned, no one was in the motel room. McCarty then made her way back to the trailer. Garner was there, but not Randolph, whom she did not see again.
 

 McCarty and a friend, Gail Rancher, then left with Garner in his Cadillac to go to another motel. On the way, Garner gave Rancher some money, and she bought more cocaine. They went to a Best Western, where Garner registered. They then went up to the room, used cocaine, and engaged in sexual activities. Around noon (May 5), the three were watching television in the room when there was a news report of a murder at a bar involving a Cadillac that looked like Garner’s. Garner “really tuned in” and lost his interest in getting high. He immediately jumped up, got dressed, said that he was going to get his car painted, and left. He came back after about half an hour. The atmosphere had become “weird” for McCarty and Rancher. They went in the bathroom and discussed how to leave. Garner was sitting on the bed, holding the phone. McCarty thought that she overheard Garner saying something about “ ‘our car’ and the news,” but she was not sure if he was speaking to anyone on the phone. McCarty and Rancher told Garner, untruthfully, that McCarty was pregnant and feeling sick, and they left the room. Because they had no money, they tried unsuccessfully to get Garner’s room deposit from the motel clerk. They then started to catch a bus, but returned to the front desk and told the clerk that they thought that Garner was involved in the murder reported on the news. McCarty called Secret Witness from the front desk, while the motel owner called the police. The police soon arrived.
 

 A police officer spoke to McCarty and then went to the motel room and spoke to Garner. Garner admitted that he owned a Cadillac but said that he had loaned it to a friend, who currently had it. Based on what McCarty had told him, the officer thought that the car might be nearby so he went in search of it. He found it in a parking lot about five blocks away.
 

 A police detective arrived and interviewed Garner at the Best Western. Garner said that he had lent his car to his friend Larry so that Larry could deliver some rock cocaine. He said that the night before he had lent the car to someone named Charles, whose last name he did not know. Garner consented to a search of his motel room, and the detective found $459.00 in small bills wrapped in a rubber band under the mattress. The detective also
 
 *777
 
 found a set of keys to a GM car. Gamer admitted that the keys were to his car, but said he gave another set to Larry. He also said that there was no way his car was involved in the Doc Holliday’s crime, and he consented to a search of his car whenever it was found.
 

 A crime scene analyst processed Garner’s car. He found the entire outside of the car, metal and windows, was covered with an oily film that precluded processing the exterior for fingerprints. Inside the car he found a nearly empty spray bottle of Armor All, the apparent source of the film. In the car’s trunk he found a VCR and a multiplexer. The VCR had a videotape in it, which was handed over to detectives. The trunk also held a plastic grocery bag containing a 9-millimeter handgun wrapped in a chamois cloth. Forensic lab analysis later showed that the handgun had fired the cartridge found at the murder scene.
 

 According to Detective James Vaccaro’s narrative at the trial, the surveillance videotape from Doc Holliday’s at the time of the murder showed the following. Lokken, the bartender, was working alone. A man, later identified as Charles Randolph, entered and sat at the bar. (Lokken knew Randolph; who worked as a cook at the establishment.) Randolph then stood up, pulled a handgun from his jacket, and leaped over the bar, confronting Lokken. The two then went back towards the cooler. Randolph later emerged from the cooler area and went to various parts of the bar, including the cash register, gaming drawers, and office.
 

 Detectives tape-recorded interviews of Garner at the jail on May 5 and May 8.
 
 [3]
 
 At the beginning of the May 5 interview, Garner asked what “guarantees” he would get for his statement and said that he needed “something to work with too.” A detective responded:
 

 I will guarantee you that if we don’t have any evidence that you were, had nothing to do with this robbery and murder that we’re talking about, and we don’t have any evidence that you weren’t in your car at the time that this robbery and murder occurred, then we don’t have any evidence to charge you with.
 

 Gamer asked for the guarantee in writing, but was persuaded to talk after the detectives pointed out their words were being recorded.
 

 Garner said he had been at the trailer smoking dope for a few days. The night before, he had loaned his car to Randolph so that Randolph could sell some dope for him. Randolph returned after
 
 *778
 
 a couple of hours and gave Garner fifty dollars. Garner then changed his story and said that Randolph had taken the car because Garner owed Randolph money. Garner related that he went for a ride with Randolph. Gamer waited while Randolph went into an apartment and came out with a gun that looked like a 9-millimeter. Randolph then dropped Garner back off at the trailer, and Garner did not know what happened after that. Garner said he did not know how his car ended up where police found it, but then admitted he parked it there. When asked what was in the car’s trank, Garner said he was “scared to find out.” Eventually, Garner admitted that he had driven Randolph to Doc Holliday’s without knowing what Randolph was going to do. Garner knew Randolph had the gun and wanted to pick up some money at the bar, but Randolph had said he used to work at the bar. Garner himself never went in the bar. Gamer said that the gun and a VCR and other stuff from the bar were in his car’s trunk. He did not know about any cash from the bar. When Garner saw the TV news report earlier that day, he realized what Randolph had done.
 

 Before the May 8 interview, Garner was read his
 
 Miranda
 
 rights. Garner was concerned about what the detectives were going to give him in return for his statement. He said that he “wanted something from the district attorney’s office.” “And I’m doing all of this signing, you know, and I’m trying to be of help all I can, but I’m not getting nothing in return, man.” A detective responded that “we can give you all the assurances that we can,” but only the district attorney could reduce to writing an agreement that Garner “isn’t going to go to jail for what happened here.”
 

 Garner nevertheless again gave a statement. His story now remained that he drove Randolph to the bar, but did not go in with Randolph and did not know what Randolph was going to do. The detective asked, ‘ ‘He had the gun before you guys went up there, right?”
 

 A: Yeah.
 

 Q: To Doc Holliday’s. And he stuck it in his pants or hid it on him somewhere?
 

 A: I think he stuck it in his pants.
 

 Q: Okay. So when he walked into Doc Holliday’s, he had that gun with him?
 

 A: I think he did. Yeah he did. He had to have, yeah, he put it in his pants. He put it in his pants.
 

 Q: Okay. So, did that put a question in your mind about what was going on in there?
 

 
 *779
 
 A: Now that you’ve mentioned it. But I didn’t, I didn’t . . . you know, ‘cause he told me he worked at this place so I wasn’t really . . .
 

 Garner testified at trial largely consistently with his last statements to police. He drove Randolph to Doc Holliday’s on the night of the murder but did not know what Randolph was going to do and did not realize what had happened until he saw the news report. However, Garner’s account regarding the murder weapon changed: Randolph had had a gun earlier that night but traded it for drugs, and Garner did not realize that Randolph had a different gun when they went to the bar.
 

 In closing argument, the State called the jury’s attention to Gamer’s desire for a deal when he spoke to detectives. The State argued that it was inconsistent for Garner to claim that he had known nothing about Randolph’s plans but would provide information if he got a deal.
 

 The jury found Garner guilty of conspiracy to commit robbery (count I), burglary while in possession of a firearm (count II), robbery with use of a deadly weapon (count III), first-degree kidnapping with use of a deadly weapon (count IV), and first-degree murder with use of a deadly weapon (count V). The district court sentenced him to prison terms of: 16 to 72 months on count I; 40 to 180 months on count n, concurrent to count I; 72 to 180 months plus a consecutive term of 72 to 180 months on count HI, concurrent to counts I and II; life with the possibility of parole after five years plus a consecutive term of life with the possibility of parole after five years on count IV, consecutive to counts III and V; and twenty to fifty years plus a consecutive term of twenty to fifty years on count V, consecutive to count IV. Garner was also ordered to pay $5,041.34 in restitution.
 

 DISCUSSION
 

 Sufficiency of the evidence
 

 Garner points out that there is no evidence that he directly committed the burglary, robbery, kidnapping, or murder. He also contends that there is no evidence that he conspired with Randolph to commit the crimes or that he knew Randolph’s intentions.
 

 In reviewing the evidence supporting a jury’s verdict, this court must determine whether the jury, acting reasonably, could have been convinced beyond a reasonable doubt of the defendant’s guilt by the competent evidence. Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). Where conflicting testimony is pre
 
 *780
 
 sented, the jury determines what weight and credibility to give it. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981). The relevant inquiry for this court is ‘ ‘ ‘whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 

 The State charged Garner with conspiring with Randolph to commit robbery and aiding and abetting Randolph in the commission of burglary, robbery, kidnapping, and murder. There appears to be no comprehensive statutory definition of conspiracy.
 
 See
 
 NRS 199.480 (providing various penalties for conspiracy to commit various crimes or acts); NRS 199.490 (providing that it is not necessary to prove any overt act was done in pursuance of a conspiracy).
 

 According to this court’s case law, conspiracy is “an agreement between two or more persons for an unlawful purpose.” Thomas v. State, 114 Nev. 1127, 1143, 967 P.2d 1111, 1122 (1998),
 
 cert. denied,
 
 120 S. Ct. 85 (1999). Conspiracy is seldom demonstrated by direct proof and is usually established by inference from the parties’ conduct.
 
 Id.
 
 Evidence of a coordinated series of acts furthering the underlying offense is sufficient to infer the existence of an agreement and support a conspiracy conviction.
 
 Id.
 
 However, absent an agreement to cooperate in achieving the purpose of a conspiracy, mere knowledge of, acquiescence in, or approval of that purpose does not make one a party to conspiracy. Doyle v. State, 112 Nev. 879, 894, 921 P.2d 901, 911 (1996). We conclude that the evidence here was sufficient for the jury to reasonably infer that Garner had agreed to aid Randolph in committing the robbery.
 

 As an initial issue, to prove conspiracy the State relied in part on evidence of matters that occurred after the robbery, but Garner contends that such evidence is not relevant to prove his intentions before the robbery. We reject this contention. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.” NRS 48.015. Conduct occurring after a crime may be relevant to proving the commission of the crime. For example, evidence of flight is circumstantial evidence which can be considered with other evidence in determining guilt. Maresca v. State, 103 Nev. 669, 674, 748 P.2d 3, 6-7 (1987). Some of Garner’s actions after the robbery are very relevant to the question of conspiracy.
 

 
 *781
 
 Viewed in the light most favorable to the prosecution, the record shows the following. On the night of the crimes, Gamer and Randolph were together at a trailer with others smoking crack cocaine. Neither had money or drags of their own. Soon after they were refused further cocaine on credit, they left together. Garner drove Randolph to a location where Randolph obtained a 9-millimeter handgun. Around 1:00 a.m., Garner drove Randolph to Doc Holliday’s and backed his car into a parking space outside the bar. Randolph entered the bar, carrying the gun, and Garner knew that Randolph had the gun. Garner waited in the car, which faced the bar and had a view of the bar’s two entrances and the entrance to the parking lot. Randolph later came out of the bar carrying a VCR, a multiplexer, and a large amount of cash. The video equipment was placed on the back seat. Garner drove away behind the bar before turning on the car’s headlights. Upon returning to the trailer, Garner helped put the video equipment in the trunk. By this time, he and Randolph had acquired several hundred dollars’ worth of cocaine. They also had hundreds of dollars in cash, and Garner repeatedly handled a bundle of small-denomination bills. Driving to the first motel, Garner told two women passengers that there was a gun in the car. At the motel, Gamer took the gun from the car and hid it in the motel room. Gamer and Randolph displayed and shared more money with the two women. At the second motel, Garner’s demeanor changed dramatically when the TV news reported a murder at Doc Holliday’s involving a Cadillac like his own. He immediately dressed, said that he was going to have his car painted, and left. He drove his car about five blocks and parked it. Garner completely covered the car’s exterior with a film of Armor All before police found it later that afternoon. After Gamer returned to the motel, he talked to someone on the phone regarding the news report and his car. When police questioned him in the case, Gamer repeatedly lied to them, changing his story several times.
 

 Some of this evidence is ambiguous, i.e., consistent both with Gamer’s claim that he drove to the bar unaware of Randolph’s criminal intentions and with the State’s theory that he conspired with Randolph. However, considered as a whole the evidence is highly incriminating and more consistent with the State’s theory. For example, Garner admitted to police (but not at trial) that he knew Randolph had a gun when Randolph entered the bar, and Garner parked the car in a location and manner that allowed him to act as a lookout and drive away quickly. Gamer had no money or drugs before the crimes and had a large amount of both soon afterwards. If he had not agreed to assist Randolph in the crimes, there is no apparent reason why Randolph would share the criminal gains so generously with him. Garner’s reactions to the news
 
 *782
 
 report are also more consistent with a concern to conceal his involvement with the crimes than with surprise at realizing that Randolph had committed the crimes. And Garner’s claim that he suspected nothing until the news report is unconvincing; his repeated evasions with police also reflect a consciousness of guilt.
 

 One piece of evidence particularly undermines Garner’s claim of ignorant innocence—his control over the handgun at the first motel. His possession of and authority over the gun just a few hours after the crimes at Doc Holliday’s are completely inconsistent with his claim that he had nothing to do with the crimes and did not even know that Randolph had a gun at the scene of the killing.
 

 This evidence was sufficient to prove the conspiracy charge, i.e., sufficient for the jury to infer that Garner agreed to drive Randolph to and from Doc Holliday’s and act as his lookout so that Randolph could commit a robbery there. The evidence also was sufficient to prove that Garner aided and abetted Randolph’s commission of the robbery and burglary. Aiding and abetting the commission of an offense is treated and punished the same as directly committing the offense.
 
 See
 
 NRS 195.020.
 

 There is no direct evidence that Garner intended or agreed that Lokken be kidnapped or murdered. Nevertheless, under the felony-murder rule, by conspiring to commit robbery Garner is liable for the murder perpetrated in the course of the robbery.
 
 See
 
 McKinney v. Sheriff, 93 Nev. 70, 72, 560 P.2d 151, 152 (1977); State v. Beck, 42 Nev. 209, 213, 174 P. 714, 715 (1918);
 
 cf.
 
 NRS 200.030(l)(b).
 

 We conclude that under the circumstances of this case Garner’s status as a conspirator and accomplice establishes his liability for the kidnapping as well. This court has held that when a person enters into a common plan or scheme but does not intend a particular crime committed by the principal, the person is liable for the crime if “in the ordinary course of things [the crime] was the natural or probable consequence of such common plan or scheme.”
 
 See
 
 State v. Cushing, 61 Nev. 132, 148, 120 P.2d 208, 216 (1941). This rule does not constitute a
 
 per se
 
 basis for holding an accomplice to one crime liable for a related crime by the principal simply because the related crime was foreseeable.
 
 See
 
 United States v. Greer, 467 F.2d 1064, 1068-69 (7th Cir. 1972). To do so would be “to base criminal liability only on a showing of negligence rather than criminal intent.”
 
 Id.
 
 at 1069. Where the relationship between the defendant’s acts and the charged crime is too attenuated, the State must provide “some showing of specific intent to aid in, or specific knowledge of, the crime charged.’ ’
 
 Id.
 
 
 *783
 

 See also
 
 Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 6.8(b), at 590-91 (2d ed. 1986). Here, the evidence established that Garner entered into a plan or scheme with Randolph to commit robbery and aided Randolph in committing the crime. We conclude that the resulting kidnapping was not attenuated from Garner’s criminal intent and actions in aid of the robbery; rather, it was in the ordinary course of things a natural or probable consequence of the planned robbery. Thus, Garner properly may be held liable for it.
 

 The evidence was sufficient to support the judgment of conviction.
 

 Evidence of and comment on appellant’s attempt to negotiate with police
 

 Garner claims that the State violated NRS 48.125 when it presented evidence of and commented on his attempts to negotiate the charges against him during the interviews on May 5 and May 8. Garner challenges only the admission of his remarks seeking a deal at the beginning of each interview and the State’s references to those remarks. He does not challenge the numerous substantive admissions which he made later in both interviews. Thus he tacitly concedes that his attempts to gain a deal were unsuccessful and the later admissions were not part of any alleged negotiating process.
 

 NRS 48.125(1) provides: “Evidence of a plea of guilty or guilty but mentally ill, later withdrawn, or of an offer to plead guilty or guilty but mentally ill to the crime charged or any other crime is not admissible in a criminal proceeding involving the person who made the plea or offer.’ ’ To determine if a discussion should be characterized as a plea negotiation, this court considers whether the accused had a subjective expectation of negotiating a plea at the time of discussion and whether that expectation was reasonable. McKenna v. State, 101 Nev. 338, 344, 705 P.2d 614, 618 (1985).
 

 Garner admits that he did not object at trial to the evidence or argument at issue. When an appellant fails to raise an issue below and the asserted error is neither plain nor constitutional in magnitude, this court need not consider it on appeal. Walch v. State, 112 Nev. 25, 34, 909 P.2d 1184, 1189 (1996). To be plain, an error must be so unmistakable that it is apparent from a casual inspection of the record. Patterson v. State, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995).
 

 The record clearly shows that Garner tried to make some kind of arrangement for clemency with the police at the start of each
 
 *784
 
 interview, but it is not clear that he actually expected to negotiate a plea. Even if he did, given the detectives’ responses to his entreaties, it is not unmistakably apparent that such an expectation was reasonable. No plain error occurred in this regard.
 

 Garner nevertheless claims that under this court’s case law his due process right to a fair trial was violated and the error cannot be considered harmless. This court refused to deem violations of NRS 48.125(1) harmless in two cases: Robinson v. State, 98 Nev. 202, 644 P.2d 514 (1982), and Mann v. State, 96 Nev. 62, 605 P.2d 209 (1980). In
 
 Robinson,
 
 the prosecutor intentionally elicited evidence of admissions made by the defendant during plea negotiations and then remarked on it three times during closing argument.
 
 Robinson,
 
 98 Nev. at 203, 644 P.2d at 514. This court concluded that the improper evidence was probably foremost in the jurors’ minds and it would be inconsistent with fair trial standards to hold the error harmless.
 
 Id.
 
 In
 
 Mann,
 
 the defendant chose not to testify after the district court erroneously ruled that statements made by the defendant in entering a guilty plea, later withdrawn, would be admissible for impeachment purposes.
 
 Mann,
 
 96 Nev. at 64, 605 P.2d at 210. In addition to violating the statute, the error implicated “serious constitutional questions concerning the privilege against compulsory self-incrimination.”
 
 Id.
 
 at 66, 605 P.2d at 211. “Since the district court’s ruling prevented appellant from testifying in his own behalf, the degree of prejudice arising from the error is unascertainable and the normal rules of harmless and reversible error do not apply.”
 
 Id.
 
 at 66-67, 605 P.2d at 211.
 

 Here, by contrast, Garner made no substantive admissions during his entreaties; thus, the evidence of these attempts to negotiate was of little significance. Garner’s crucial admissions came only later after any alleged negotiations had ended. Also, Garner was not prevented from testifying at trial; he took the stand and told the jury his version of events. Therefore, even assuming that evidence of and reference to his attempts to negotiate were error, any resulting prejudice was negligible and harmless beyond a reasonable doubt.
 

 The instruction on voluntary intoxication and specific intent
 

 Garner asserts that the jury instruction on voluntary intoxication erroneously suggested that he had the burden to prove that he lacked specific intent to commit the charged offenses. Gamer is correct regarding the error in the instruction, but the error was of no consequence since Garner was not entitled to the instruction in the first place.
 

 
 *785
 
 The district court rejected an instruction on voluntary intoxication offered by Garner based on NRS 193.220.
 
 [4]
 
 The State objected to instructing on voluntary intoxication, but provided the following instruction, which the district court gave as Instruction No. 34.
 

 No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition.
 
 In order to negate specific intent,
 
 the evidence must show not only the defendant’s consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings.
 

 (Emphasis added.)
 

 Much of the second sentence of Instruction No. 34 comes from Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985), which concluded that the district court properly refused an instruction on voluntary intoxication.
 

 In order for a defendant to obtain an instruction
 
 on voluntary intoxication as negating specific intent, the evidence must show not only the defendant’s consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings.
 

 Nevius,
 
 101 Nev. at 249, 699 P.2d at 1060 (emphasis added).
 

 The language emphasized from
 
 Nevius
 
 refers to the burden of production a defendant must meet to obtain an instruction. It does not set forth a burden of proof a defendant must meet to negate specific intent, as the language emphasized in Instruction No. 34 suggests.
 
 [5]
 
 In effect, the instruction informed the jury that Garner had to prove that he was so intoxicated that he lacked any requisite specific intent.
 

 
 *786
 
 The State does not dispute Garner’s claim that specific intent is an element of conspiracy, burglary, and willful, deliberate, and premeditated murder. Nor does it dispute that the prosecution has the burden of proving every element of a charged crime. The latter proposition is black letter law.
 
 E.g.,
 
 Barone v. State, 109 Nev. 778, 780, 858 P.2d 27, 28 (1993). The State simply claims in a conclusory way that the instruction is not erroneous. Alternatively, it argues that any error was harmless.
 

 We conclude that the instruction was erroneous: it improperly implied that the defense had the burden to disprove an element of the State’s case.
 
 Cf. Barone,
 
 109 Nev. at 780, 858 P.2d at 28 (holding that requiring defendant to negate unlawfulness element of battery by proving self-defense violates due process by diluting State’s burden of proving every element of charged crime); Shrader v. State, 101 Nev. 499, 505, 706 P.2d 834, 838 (1985) (reversing where instruction on entrapment failed to inform jury that State ultimately bore burden of proving that defendant had predisposition to commit crime).
 

 However, the error was harmless for two reasons. First, Garner never presented a defense of lack of specific intent due to voluntary intoxication. Although Garner testified that he had gone without sleep, had consumed drugs, and was not always thinking clearly, this evidence was offered to explain his actions and statements after the crimes were reported and after police questioned him. His defense to the crimes remained simply that he never knew what Randolph planned to do, and defense counsel in closing argument presented that same defense and never mentioned or relied on voluntary intoxication. Therefore, we conclude that an incorrect instruction on voluntary intoxication had no practical impact on the jury’s deliberations.
 

 Second, Garner was not entitled to an instruction on voluntary intoxication. As noted above, to obtain such an instruction, “the evidence must show not only the defendant’s consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings.”
 
 Nevius,
 
 101 Nev. at 249, 699 P.2d at 1060. Garner did not present evidence on the effect that his consumption of drugs had on his mental state.
 

 The instruction on conspiracy
 

 Garner claims that the jury was improperly instructed regarding conspiracy. He challenges Instruction No. 8, which stated in part that to prove a conspiracy it was not necessary to show “the making of an express or formal agreement.” This claim has no merit.
 

 
 *787
 
 First, Gamer never objected to the instruction. On the contrary, defense counsel told the district court that the instructions as a whole correctly instructed the jury on conspiracy. Therefore, Garner must show that the instruction constituted plain or constitutional error.
 
 See Walch,
 
 112 Nev. at 34, 909 P.2d at 1189. He cannot. He claims that Instruction No. 8 told the jury that no agreement was necessary to establish conspiracy. This misrepresents the instruction, which states that no “express or formal” agreement is required. Further, Garner completely ignores Instruction No. 6, which told the jury: “A conspiracy is an agreement between two or more persons to commit any criminal or unlawful act.”
 

 The instruction on deliberation and premeditation
 

 In his opening brief, Garner argues that the jury was improperly instructed on the meaning of malice, deliberation, and premeditation. Shortly after the opening brief was filed, this court entered its decision in Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000). In his reply brief, Garner asserts that
 
 Byford
 
 requires reversal of his conviction.
 
 [6]
 

 Garner admits that he did not object at trial to this jury instruction. Therefore, this issue is not preserved for consideration on appeal unless use of the instruction constituted plain or constitutional error.
 
 [7]
 

 See Walch,
 
 112 Nev. at 34, 909 P.2d at 1189. Under
 
 Byford,
 
 there was no such error.
 

 Our opinion in
 
 Byford
 
 concludes that the
 
 Kazalyn
 
 instruction does not fully define “willful, deliberate, and premeditated,” and it provides other instmctions for future use—but it does not hold that giving the
 
 Kazalyn
 
 instruction constituted error, nor does it articulate any constitutional grounds for its decision.
 
 By ford,
 
 116 Nev. at 233-37, 994 P.2d at 712-15. Instead, the opinion relies on
 
 *788
 
 and gives effect to the relevant statutory language in NRS 200.030(l)(a). Most pertinently,
 
 Byford
 
 states that
 

 the
 
 Kazalyn
 
 instruction . . . do[es] not do full justice to the phrase “willful, deliberate, and premeditated.” . . .
 

 Because deliberation is a distinct element of
 
 mens rea
 
 for first-degree murder, we direct the district courts to cease instructing juries that a killing resulting from premeditation is “willful, deliberate, and premeditated murder.” Further, if a jury is instructed separately on the meaning of premeditation, it should also be instructed on the meaning of deliberation.
 

 Id.
 
 at 235-36, 994 P.2d at 714. The opinion then sets forth jury instructions for future use.
 
 Id.
 
 at 236-37, 994 P.2d at 714-15.
 

 Thus, contrary to Garner’s characterization of
 
 Byford,
 
 the opinion does not hold that giving the
 
 Kazalyn
 
 instruction was error or violated any constitutional rights. Indeed, we affirmed the appellant’s conviction in
 
 Byford
 
 notwithstanding the use of the
 
 Kazalyn
 
 instruction. To the extent that our criticism of the
 
 Kazalyn
 
 instruction in
 
 Byford
 
 means that the instruction was in effect to some degree erroneous, the error was not plain. Before
 
 Byford
 
 was decided, our case law was divided on this issue, and several opinions of this court supported use of the instruction.
 
 See id.
 
 at 233-35, 994 P.2d.at 712-14.
 

 Therefore, under
 
 Byford,
 
 no plain or constitutional error occurred here. Independently of
 
 Byford,
 
 however, Gamer argues that the
 
 Kazalyn
 
 instruction caused constitutional error. We are unpersuaded by his arguments and conclude that giving the
 
 Kazalyn
 
 instruction was not constitutional error.
 

 Nevertheless, Garner maintains that
 
 Byford
 
 has retroactive effect and should be applied to convictions which have not yet become final,
 
 [8]
 
 regardless of a failure to preserve the issue below. It is true that “failure to apply a newly declared constitutional mle to criminal cases pending on direct review violates basic norms of constitutional adjudication.” Griffith v. Kentucky, 479 U.S. 314, 322 (1987). But, as discussed above,
 
 Byford
 
 does not invoke any constitutional mandate in directing that its new instructions be given in future cases, so there is no constitutional requirement that this direction have any retroactive effect.
 

 On the contrary, this court has generally held that new rules of law apply prospectively unless they are rules of constitutional law,
 
 *789
 
 when they apply retroactively only under certain circumstances. Bridgewater v. Warden, 109 Nev. 1159, 1161, 865 P.2d 1166, 1167 (1993); Gier v. District Court, 106 Nev. 208, 212, 789 P.2d 1245, 1248 (1990). Therefore, the required use of the
 
 Byford
 
 instructions applies only prospectively. Thus, with convictions predating
 
 Byford,
 
 neither the use of the
 
 Kazalyn
 
 instruction nor the failure to give instructions equivalent to those set forth in
 
 Byford
 
 provides grounds for relief.
 

 Garner failed to object to the use of the
 
 Kazalyn
 
 instruction at his trial and therefore failed to preserve this issue for appeal absent a showing of plain or constitutional error. Use of the
 
 Kazalyn
 
 instruction in trials which predate
 
 Byford
 
 does not constitute plain or constitutional error. Nor do the new instructions required by
 
 Byford
 
 have any retroactive effect on convictions which are not yet final: the instructions are a new requirement with prospective force only.
 
 [9]
 

 CONCLUSION
 

 We affirm Garner’s judgment of conviction and sentence.
 

 [1]
 

 Pursuant to NRAP 34(f)(1), we have determined that oral argument is not warranted in this appeal. Also, cause appearing we deny appellant’s request, filed April 24, 2000, concerning publication of this opinion.
 

 [2]
 

 All dates relevant to the commission and investigation of the crimes in this case are in 1998.
 

 [3]
 

 Garner was not read his rights under Miranda v. Arizona, 384 U.S. 436 (1966), before the interview on May 5. However, after Gamer testified at the trial, the State introduced evidence of the interview for impeachment purposes without objection.
 

 [4]
 

 NRS 193.220 provides:
 

 No act committed by a person while in a state of insanity or voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his insanity or intoxication may be taken into consideration in determining the purpose, motive or intent.
 

 [5]
 

 This court has made this same distinction in regard to the defense of entrapment.
 

 [T]he ‘affirmative’ nature of the [entrapment] defense merely requires the defendant to put forth evidence of governmental instigation. Thereafter it is incumbent upon the state to demonstrate the defendant’s predisposition. Essentially, the defendant bears the burden of production on the first element, while the prosecution subsequently bears the burden of proof on the second element.
 

 Shrader v. State, 101 Nev. 499, 504, 706 P.2d 834, 837-38 (1985).
 

 [6]
 

 Jury instruction number 32 in this case defined premeditation as
 

 a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
 

 Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.
 

 This is “the
 
 Kazalyn
 
 instruction” considered by this court in
 
 Byford. Byford,
 
 116 Nev. at 233, 994 P.2d at 712.
 

 [7]
 

 As explained in note 9 below, the practical effect of failing to preserve this issue is inconsequential.
 

 [8]
 

 A conviction becomes final when the judgment of conviction has been entered, the availability of appeal has been exhausted, and a petition for certiorari to the United States Supreme Court has been denied or the time for such a petition has expired.
 
 See
 
 Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987).
 

 [9]
 

 This does not mean, however, that the reasoning in
 
 Byford
 
 is unprecedented. Although
 
 Byford
 
 expressly abandons some recent decisions of this court, it also relies on long-standing statutory language and other prior decisions of this court in doing so. Basically,
 
 Byford
 
 interprets and clarifies the meaning of a preexisting statute by resolving conflicting lines in prior case law. Therefore, its reasoning is not altogether new.
 

 Because the rationale in
 
 Byford
 
 is not new and could have been—and in many cases was—argued in district courts before
 
 Byford
 
 was decided, it is fair to say that the failure to object at trial means that the issue is not preserved on appeal. However, in practical terms, the failure to preserve a challenge to the
 
 Kazalyn
 
 instruction is inconsequential since use of the
 
 Kazalyn
 
 instruction is not grounds for reversal under
 
 Byford.
 

 As this court receives appeals from post-conviction habeas petitioners citing
 
 Byford
 
 on this issue, it appears that analogous treatment will be in order. The reasoning in
 
 Byford
 
 may be apposite to a post-conviction habeas claim, but the claim will be procedurally barred unless a petitioner can show good cause for not raising the issue before—or for raising it again—and prejudice.
 
 See
 
 NRS 34.810(3). In short, absent extraordinary circumstances, nothing in
 
 Byford
 
 provides grounds for a successive habeas petition: anything new in the decision is not retroactive, and anything not new will be procedurally barred from consideration.